**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
AMEROL CORPORATION,

                        Plaintiff,

         - against -

AMERICAN CHEMIE-PHARMA, INC., et al.,

                    Defendants.
-----------------------------------------------------------X

**MEMORANDUM**
**AND ORDER**

CV 04-0940 (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

       Plaintiff Amerol Corporation ("Amerol") accuses defendant American Chemie-Pharma, Inc. ("ACP") of breaching a contract and it further accuses defendant Atkins, Harris & Brown ("Atkins") of tortiously interfering with its prospective contracts and business relations. *See* Docket Entry ("DE") 1 ("Complaint"). ACP has in turn filed counterclaims accusing Amerol of breach of contract. *See* DE 8 ("Answer"). ACP and Atkins seek to dismiss all of Amerol's claims pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) – a motion that I deem instead to seek summary judgment pursuant to Rule 56 because the parties' respective submissions on the motions rely on matters outside the pleadings. *See*, *e.g.*, *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Control Towers Condo.*, 848 F.2d 24, 25) (2d Cir. 1988)). ACP also seeks summary judgment in its favor pursuant to Rule 56 on its counterclaims. *See* DE 23. Finally, in the course of opposing the defendants' motions, Amerol sought leave to amend its complaint. For the reasons set forth below, I grant Amerol leave to amend its complaint, deny the defendants' motion for summary judgment on each of Amerol's claims, and grant ACP's motion for summary judgment on its counterclaims.

I.      Background

A.      The Parties' Submissions

I have reviewed the following submissions in addition to the pleadings listed above (for

ease of reference, I list them here with the abbreviations I will use in citing to them):

| DE# | Abbreviation | Description |
| --- | --- | --- |
| 8 | "Answer" | Answer Affirmative Defenses and Counterclaims |
| 23 | "Memo." | Motion of Defendants, [ACP and Atkins], to Dismiss Complaint Pursuant to [Rule] 12 (b)(6) and in Support Of Motion for Summary Judgment Pursuant to [Rule] 56 and Local Rule 56.1. |
| 24 | "Kamdar Aff." | Affidavit [of Mukesh Kamdar] in Support of Defendant's Motion for Summary Judgment |
| 25 | "Reply" | Reply Memorandum of Law of Defendants [ACP and Atkins], in Further Support of Defendants' Motion to Dismiss Complaint Pursuant to [Rule] 12(b)(6) and in Further Support of Defendant's Motion for Summary Judgment Pursuant to [Rule] 56 and Local Rule 56.1 |
| 27 | "ACP Stmt." | Defendant's Amended Statement of Material Facts on Motion for Summary Judgment Pursuant to Local Civil Rule 56.1 |
| 28-1 | "Sartorio Aff." | Affidavit [of Dominic Sartorio] in Opposition to Defendants' Motion to Dismiss and for Summary Judgment and in Support of Plaintiff's Cross-Motion to Amend, including Exhibits 1-6 [DE 28-2 to 28-7, respectively] |
| 28-7 | "Amended Comp." | Amended Complaint [filed as Exhibit 6 to Sartorio Aff.] |
| 28-8 | "Amerol Notice" | Notice of Cross-Motion |
| 29 | "Opp." | Amerol Corporation's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint and for Summary Judgment on American Chemie-Pharm, Inc.'s Counterclaims and in Support of Amerol's Cross-Motion to Amend the Complaint |
| 30 | "Amerol Stmt." | Rule 56.1 Counter-Statement by Plaintiff Amerol Corporation |

B.    Factual Background

Amerol is a chemical wholesaler that purchases chemicals from manufacturers such as ACP and then resells them to its end-user customers.  DE 1 ("Complaint") ¶ 8; Sartorio Aff. ¶ 10. The parties agree that in late 2003 ACP made a series of shipments to Amerol of two chemical compounds – Tertiary Butyl Hydroquinone ("TBHQ") and Microcrystalline Cellulose ("MCC") – that form the basis of their dispute in this case.  They further agree that Amerol never paid for any of those shipments.  *See* ACP Stmt. ¶¶ 1, 2, 5; Amerol Stmt. ¶¶ 1, 5.

One of those shipments in particular is at the heart of this case.  On November 17, 2003, Amerol placed an order with ACP for 500 kilograms of MCC for a total price of $1,200; ACP made delivery two days later.  *See* Complaint ¶ 11; Answer ¶ 11; ACP Stmt. ¶ 2; Amerol Stmt. ¶ 2.  Four weeks later, Amerol's Chief Executive Officer Dominic Sartorio ("Sartorio") advised ACP that he would provide payment for one of the company's outstanding invoices on December 22, 2003 and two others a week after that.  The day after Sartorio made that statement, ACP shipped 5,050 kilograms of TBHQ to Amerol.  On January 9, 2004, with neither of the promised December payments having been made, Amerol offered a revised payment schedule proposing one payment to coincide with the shipment of additional goods and payment for the remainder of the outstanding funds to follow one week later.  *See* Kamdar Aff. ¶¶ 18, 20, Exs. 3-4.  Amerol ultimately did not make those payments.

After receiving ACP's shipment of MCC on November 19, 2003, Amerol resold the compound to its customer Aquarium Limited ("Aquarium").  On January 23, 2004, Aquarium reported in an email to Amerol that it had found a razor blade in one of the bags of MCC.  *See* Sartorio Aff. Ex. 3.

At around this time ACP appears to have engaged Atkins to assist it in seeking payment from Amerol for its outstanding invoices (or at least, I infer as much from the parties' submissions, which do not make explicit the precise relationship between Atkins and ACP). *See id.* Ex. 4 (letters drafted by Amerol's attorneys purportedly in response to letters from ACP and Atkins seeking payment); *id.* Ex. 5 (referring to ACP as Atkins' client). Thus, after receiving Aquarium's complaint about the MCC shipment, Amerol's counsel notified both Atkins and ACP of its contention that the product ACP had manufactured and shipped to Amerol was defective. *See id*. Ex. 4 (letters to Atkins and ACP's counsel dated, respectively, Jan. 29 and Feb. 2, 2004).

The parties disagree about one aspect of Atkins' efforts on behalf of ACP. Amerol asserts that Atkins contacted Amerol's customers in early 2004 to advise them that Amerol was a "deadbeat" customer. *See id.* ¶ 21. Atkins denies having done so. Answer ¶¶ 16-19.

    C.    <u>The Parties' Respective Claims</u>

Amerol commenced this lawsuit on February 19, 2004, by filing a Complaint that includes three claims. Amerol first asserted that Atkins tortiously interfered with its prospective contracts and business relations. Complaint ¶¶ 22-23. The remaining claims sought damages from ACP as a result of the allegedly defective nature of the MCC shipment: the second claim sought recovery for consequential and incidental damages arising from ACP's alleged breach of contract pursuant to Section 2-715 of the Uniform Commercial Code ("UCC") and the third sought direct damages for the breach itself. *Id*. ¶¶ 24-28. The substance of the latter claims does not match the headings above them in the Complaint: the heading for the single claim against Atkins purported to announce a claim against ACP, and the heading above the final substantive

claim against ACP referred instead to Atkins. Amerol corrected these errors in its proposed Amended Complaint.

On April 14, 2004, the defendants jointly filed a pleading containing their answer to Amerol's claims, four affirmative defenses, and three counterclaims (one of which has since been withdrawn). The four affirmative defenses – which do not specify the specific claims they are designed to defeat – are: failure to state a cause of action, failure to reject the defective goods within a reasonable time, failure to pay for shipped goods, and unjust enrichment. Answer ¶¶ 29-33. In the two counterclaims still at issue, which seek the same relief under two different legal theories, ACP seeks payment for the five shipments of chemical products that it delivered to Amerol in late 2003. Answer ¶¶ 34-50. Both defendants joined in a third counterclaim, seeking recovery of the costs of defending against Amerol's "baseless claims," *id.* ¶ 52, but later withdrew it on March 7, 2005. *See* DE 26.

II.     Discussion

        A.      Preliminary Matters

                1.      Choice Of Law

"Under New York law, 'in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied.'" *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993) (quoting *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984)). The parties' reliance on New York law suggests they are in agreement that New York law should apply. *See Premier Mountings, Inc. V. Clyde Duneier*, 2003 WL 21800082, *2 (S.D.N.Y. Aug. 6, 2003). Given the parties' apparent agreement on the matter, the fact that the events at issue occurred in New York, and the absence

of any apparent policy consideration to the contrary, I will analyze the issues before me under the law of New York.  *See id*.

### 2.    Amerol May File Its Proposed Amended Complaint

Amerol seeks leave to amend its complaint pursuant to Rule 15(a) to add additional facts regarding the damages it allegedly sustained subsequent to filing suit.  In support of that request, Amerol argues that because no discovery has yet been conducted no prejudice will result from the amendment.  Opp. at 3.  I agree.

Under Rule 15(a), it is within the district court's discretion to grant leave to amend a pleading.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Campo v. 1st Nationwide Bank*, 857 F.Supp. 264, 269 (E.D.N.Y. 1994).  Such leave is to be freely given "when justice so requires." Rule 15(a).  Denial of such a motion is only justified where a court finds "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment.'" *Foman v. Davis,* 371 U.S. 182.  There is no such basis for denying Amerol leave to amend, and by granting such relief I can assess the viability of Amerol's claims on the basis of all the allegations it seeks to make rather than simply on those made in the original complaint that Amerol now perceives to be incomplete.

### B.    Legal Standards

### 1.    Rule 12(b)(6)

The function of a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is "to assess the legal feasibility of the complaint."  *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir. 1984) (internal quotation

omitted). A district court must accept as true all factual allegations in the complaint, and view the pleadings in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir. 1994). Such a motion should be denied unless it is beyond doubt that a plaintiff can prove no set of facts entitling him to relief. *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 79 (2d Cir. 2003). The issue is not whether it is likely that the plaintiff will prevail, but simply whether there is a possibility, however remote, that she might. *See Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir. 1976). In deciding a motion under Rule 12(b)(6), a district court must limit itself to the facts stated in the complaint. *See Ryder Energy,* 748 F.2d 779. If the court considers materials outside the pleadings, it must treat the motion as one for summary judgment pursuant to Fed. R. Civ. P. 56. *Id.*

Where parties submit extra-pleading material such as affidavits and exhibits in connection with a motion to dismiss, a court has two options: it may either disregard such material or treat the motion as one for summary judgment. The latter option requires notice to the parties and the opportunity to present evidence outside the pleadings. *See Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995). Notice need not be express: "The essential inquiry is whether the [party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." *Groden,* 61 F.3d 1053 (quoting *In re G. & A. Books, Inc.,* 770 F.2d 288, 294-95 (2d Cir.1985), *cert. denied,* 475 U.S. 1015 (1986)). Formal notice is not required where both sides have supplied the court with matters outside the pleadings. *See Lennon v. Seaman*, 63 F. Supp.2d 428, 442 (S.D.N.Y. 1999) (citing *Cantor v.*

*NYP Holdings, Inc.,* 51 F. Supp.2d 309, 310 (S.D.N.Y. 1999)).  Where a plaintiff submits an affidavit in connection with his opposition to the defendant's motion to dismiss, the plaintiff has invited the conversion and is deemed to have notice of it.  *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir. 1999).  Finally, although the decision of whether to disregard extra-pleading materials or convert a dismissal motion into one for summary judgment is committed to the district court's discretion, such conversion may not be appropriate before the parties have completed discovery. *See Lucas v. Planning Bd. of Town of LaGrange,* 7 F. Supp.2d 310, 319 (S.D.N.Y. 1998).

### 2. The Summary Judgment Standard

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c)).  In determining whether to grant summary judgment, a court is confined to issue-finding, not issue resolution.  *Rasmussen v. Sigma Corp. of America*, 27 F. Supp.2d 388, 391 (E.D.N.Y. 1998) (citations omitted).  The court does not "'weigh the evidence and resolve factual issues'" but rather "'determine[s] as a threshold matter whether there are genuine unresolved issues of material fact to be tried.'"  *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 408 (2d Cir. 1991) (quoting *Gibson v. American Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989)); *see* Rule 56(c).  A fact is material if it "'might affect the outcome of the suit under the governing law.'"  *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue is presented if "'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'"  *Id*.  In assessing the

evidence, "[a]ll factual inferences are to be resolved in favor of the non-movant." *Transco*

*Prods., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555 (Fed. Cir. 1994).

        C.        ACP's Motion to Dismiss Amerol's Contract Claims

                1.        Conversion To A Motion For Summary Judgment

In its second and third claims for relief, Amerol seeks recovery for damages it claims to

have sustained as a result of ACP's alleged breach of contract with respect to the MCC shipment

of November 19, 2003. Specifically, Amerol contends that ACP was responsible for the

presence of the razor blade that Aquarium found in its MCC, and that the presence of that razor

blade rendered ACP's delivery defective (or to adopt the usage of the UCC, nonconforming).

ACP seeks to dismiss these claims.

In litigating the motion, both sides have submitted evidence outside the pleadings about

the MCC shipment of November 19, 2003, and also about the other shipments that ACP made to

Amerol in late 2003 for which it now seeks payment by means of its counterclaims. *See* Kamdar

Aff.; Sartorio Aff. Both sides rely on this evidence in making arguments on the motion to

dismiss Amerol's contract claims (and also in making arguments on ACP's motion for summary

judgment on its counterclaims). Opp. at 19-20; Reply at 13-14. Given the factual

interrelatedness of the various claims at issue – some of which are before me on a motion to

dismiss, and others on a motion for summary judgment – I will convert the dismissal motion to

one for summary judgment rather than disregard the evidence in assessing the viability of

Amerol's contract claims.

Although I have not formally notified the parties of my intent to effect such a conversion,

my decision to do so will come as no surprise to any of them in light of their evidentiary

submissions and the substantial factual overlap between the dismissal motion and the motion for summary judgment. Moreover, both parties have had the opportunity to submit relevant materials. *See Ahmed v. Gelfand*, 160 F. Supp.2d 408, 412 (E.D.N.Y. 2001).

Finally, my decision to convert the dismissal motion and treat it as one seeking summary judgment ultimately has no substantive affect on the outcome or the parties' respective rights. For the reasons discussed below, I conclude that ACP is not entitled to judgment in its favor on Amerol's contract claims at this stage of the proceedings, and I would reach the same conclusion even without converting the motion. By considering the motion as one seeking summary judgment, I merely take into account all of the record rather than part of it; but by doing so I do not preclude the possibility that, at a later stage of the proceeding, ACP may be entitled to seek and obtain dispositive relief on the strength of additional facts that may be established through further discovery.

2.      The Merits Of Amerol's Contract Claims

Amerol seeks two different forms of relief on the basis of its allegation that ACP delivered a defective shipment of MCC on November 19, 2003. In one claim, which Amerol has designated as its "Third Claim For Relief," it asserts that ACP breached its contract, and therefore seeks direct damages under the contract itself. Amended Complaint ¶¶ 28-30. For reasons not entirely clear to me, Amerol seeks damages on this claim "in an amount to be determined at trial, but in no event less than $1,200," *id*. ¶ 30, even though the parties agree that Amerol never actually paid the $1,200 price of that shipment. In the other claim, which Amerol designates its "Second Claim For Relief," Amerol seeks a greater amount of consequential and incidental damages that it claims it sustained as a result of re-selling the defective MCC shipment

to its own customer, Aquarium.  *See id*. ¶¶ 25-27.  ACP argues that it is liable on neither claim because Amerol accepted the MCC shipment (as well as others) without objection and failed to provide any notice of the alleged defect prior to bringing the instant lawsuit.  It goes on to assert that Amerol's failures in that regard not only bar its affirmative claims but also render it liable to ACP for the full amount owed on the invoices for all five shipments.  *See* Memo. at 14.

In addressing ACP's motion to dispose of these claims as well as its related motion for summary judgment in its favor on the counterclaims seeking payment for the shipments at issue, the parties have discussed – and to some extent conflated – two distinct concepts that affect the respective rights of buyers and sellers under New York's Uniform Commercial Code.  As explained below, ACP's counterclaims implicate the statutes relevant to a buyer's acceptance or declination of goods, but the claims for damages in Amerol's complaint implicate the distinct concept of "notice of defect."

New York law allows a buyer to decline to accept defective or nonconforming goods. That declination can take two forms:  timely "rejection" or a subsequent "revocation" of an initial acceptance later discovered to be non-conforming.  *See* N.Y. UCC § 2-601 (rejection); *id*. § 2-608 (revocation).  Either form of declination must be timely communicated to the seller:  a rejection must occur within a "reasonable time" after delivery or tender and is "ineffective unless the buyer seasonably notifies the seller," *id*. § 2-602(1), and revocation must likewise be timely made after discovery of the defect.  *Id*. § 2-608.  A buyer who accepts nonconforming goods and does not timely revoke that acceptance is liable for payment of the contract price notwithstanding the defect.  *Id*. § 2-607(2).  A buyer who has timely rejected (or revoked its earlier acceptance of) defective goods has no such obligation to pay.  *Id*. § 2-714.

The provisions governing acceptance, rejection, and revocation define the buyer's obligation to pay for goods. However, they do not define the limits of the buyer's right to seek relief for damages caused by a seller's delivery of defective goods. That is, even a buyer who does *not* timely reject or revoke acceptance of a shipment of defective goods may sue the seller for damages caused by the defect. *See id*. §§ 2-607(2) ("acceptance does not of itself impair any other remedy provided by this Article for non-conformity"), 2-714 ("Buyer's Damages for Breach in Regard to Accepted Goods"), 2-715 ("Buyer's Incidental and Consequential Damages"); *Cliffstar Corp. v. Elmar Indus., Inc.*, 678 N.Y.S.2d 222, 222 (App. Div. 1998). To preserve such a claim for damages, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" N.Y. UCC § 2-607(3).

The distinction between rejection or revocation on the one hand and notice of defect on the other is an important one. As discussed further below in Part D of this decision, the existence of a factual dispute as to whether Amerol sufficiently rejected or revoked the MCC shipment could preclude summary judgment on ACP's counterclaim for payment, but it would say nothing about the viability of Amerol's Second and Third Claims for Relief. Whether those latter claims can withstand summary judgment turns on the sufficiency of Amerol's notice of defect.

Amerol contends that it provided written notice of the defect at issue to ACP within one week of learning about it in the email from Aquarium. Opp. at 7-10. Specifically, it relies on two letters that its attorneys wrote within a week of receiving Aquarium's complaint about the razor blade it discovered in the MCC shipment. The letters were sent to, respectively, Terry Brown of Atkins and an attorney named Barry Silberzweig who I infer was then representing

ACP.  *See* Sartorio Aff. Ex. 4 (copies of letter from to Terry Brown dated Jan. 29, 2004 (the

"Atkins Letter"), and  letter to Barry Silberzweig dated Feb. 2, 2004 (the "ACP Letter")).  Neither

letter mentions the razor blade (or, for that matter, provides any indication that Amerol intended

to reject the goods or revoke its prior acceptance, a fact to which I will return later).  The Atkins

letter seems primarily concerned with expressing dissatisfaction with Atkins' collection efforts

and threatening legal action as a result.  To the extent it discusses the allegedly defective MCC

shipment, it does so without specifying the nature of the defect and solely in terms of a

prospective lawsuit:  "you may advise your client, that based upon the fact that it forwarded

defective microcrystalline powder to Amerol, that it will be sued for, among other things, breach

of contract, and for products liability."  Atkins Letter.  The ACP letter is similar, in that it seems

to focus on ACP's debt collection efforts and contains a number of threats and accusations.  The

only mention of the November 2003 MCC shipment comes in the penultimate paragraph in

which the author advises that ACP "manufactured a defective product that was ultimately

delivered to our client, and as a result thereof, Amerol has suffered damages."  ACP Letter.

     Whereas a buyer's rejection or revocation must be "unequivocal," s*ee Sears, Roebuck &*

*Company v. Galloway*, 600 N.Y.S.2d 773, 775 (App. Div. 1993), the notice required to preserve

its right to sue for damages need only "alert [the prospective defendant] that the transaction [was]

troublesome."  *See Cliffstar*, 678 N.Y.S.2d at 223 (finding that a buyer's complaints and request

for service were sufficient to preserve the right to sue for damages although insufficiently timely

or specific to constitute rejection or revocation of acceptance).  It is entirely possible that a trier

of fact could find that the letters Amerol's attorneys sent to ACP and Atkins satisfy that lesser

burden.

Sartorio avers in a sworn affidavit that the November 19 shipment contained a sharp razor blade and that Amerol's customer, upon discovering it, refused to pay Amerol for the shipment. Sartorio Aff. ¶ 15; *but see id*. Ex. 3 (email from Aquarium to Amerol notifying the latter of the blade and inquiring as to safety precautions but saying nothing about Aquarium's refusal to pay for the goods or cessation of business with Amerol). This evidence raises issues of material fact about ACP's delivery of defective goods and resulting damages to Amerol, and therefore suffices to defeat ACP's motion for summary judgment on the breach of contract claim.

The latter conclusion further compels me to deny summary judgment as to Amerol's claim for consequential and incidental damages. Amerol claims that it lost Aquarium's business as a result of selling it the tainted MCC, and has thereby lost prospective annual profits of $52,210. *See* Amended Comp. ¶¶ 26-27; Sartorio Aff. ¶ 19. ACP argues that Amerol may not recover such consequential or incidental damages because it has failed to state a claim for breach of contract. Memo. at 15. Because I disagree with ACP's premise, I must reject its conclusion.

Under New York law, a breach-of-warranty claimant can recover for the loss of future profits or goodwill. *See Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 780-782 (2d Cir. 1994) (citation omitted). In order to recover for its lost profits, Amerol will have to meet the stringent requirements of proof imposed by New York law. Amerol will have to prove the loss with reasonable certainty, offer objective proof of the amount of loss, and demonstrate that the loss was directly caused by and traceable to ACP's breach. *See id.* at 781 (citations omitted). Although Amerol's submissions suggest that it will have difficulty meeting this heavy burden, I am constrained on the instant record to give it the chance to try.

D.    ACP's Motion For Summary Judgment On Its Counter-Claim

Because ACP's counterclaims for payment on its shipments to Amerol implicates much of the same contract law discussed above, I turn next to its motion for summary judgment on those counterclaims before returning to an assessment of the viability of Amerol's remaining claim of tortious interference against Atkins. ACP has raised two counterclaims seeking such payment: one for an account stated and the other for breach of contract. In its motion seeking summary judgment, ACP addresses only the former. Because, as explained below, I agree that ACP is entitled to summary judgment on that counterclaim, I assume that its remaining counterclaim for breach of contract is moot.

"An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due." *Jim-Mar Corp. v. Aquatic Construction, Ltd.*, 600 N.Y.S.2d 790, 791 (App. Div. 1993). Such an agreement can be implied through the parties' course of dealing when invoices are retained without objection. *Id.* Evidence that the defendant received and retained invoices without objection is sufficient to sustain summary judgment for a claim of account stated. *Id.* To defeat a motion for summary judgment for account stated, the defendant must raise specific and genuine factual issues regarding the plaintiff's right to recover. *See Cibro Petroleum Products, Inc. v. Onondago Oil Company, Inc.,* 534 N.Y.S.2d 480, 480 (App. Div. 1988). Vague and conclusory denials are insufficient to create a triable issue of fact. *See id*.

ACP contends that it has never received payment for five shipments that Amerol accepted without objection. Kamdar Aff. ¶¶ 4, 6. As evidence of the amounts due it, ACP submitted five numbered invoices for deliveries of TBHQ and MCC that it made to Amerol. *See id*. Ex. 1.

Each of the invoices provides a description of the goods including the quantity and price, the total amount due, and a statement that payment is due within thirty days. *Id.* The following is a summary of the invoices submitted:

| Invoice Number: | Invoice Date: | Description: | Amount: |
| --- | --- | --- | --- |
| 2031 | 10/16/03 | 3500 Kg TBHQ | $43,750.00 |
| 2034 | 10/24/03 | 2600 Kg TBHQ | $32,500.00 |
| 2046 | 11/19/03 | 500 Kg MCC | $1,200.00 |
| 2062 | 12/01/03 | 400 Kg TBHQ | $5,000.00 |
| 2063 | 12/19/03 | 5050 Kg TBHQ | $63,125.00 |

*Id.* That the invoices were received by Amerol without protest is evidenced by an email from its Chief Executive Officer promising to make payment for at least some of those shipments within two weeks. *See id.* Ex. 3 (email from Dominic Sartorio dated December 17, 2003 assuring payment of invoice 2031 on December 22, 2003, and payment of invoices 2034 and 2046 a week later). A subsequent email from Amerol indicates that those payments were not made. *See id.* Ex. 4 (email from Frank Monteleone to ACP dated January 9, 2004).

ACP argues that these invoices, along with invoices from earlier shipments that were submitted by Amerol as exhibits to its Cross Motion, establish that the parties had an ongoing business relationship. Memo. at 4; *see* Sartorio Aff. Ex. 1 (paid invoices from July and August of 2003). ACP argues that Amerol fails to raise a triable issues of fact with regard to its liability for the five shipments at issue. *Id.* at 5. I agree.

Amerol first argues that ACP's motion is procedurally defective because it fails to comply with Local Civil Rule 56.1 and Rule III.D.2 of my individual practice rules. Opp. at 4. Specifically, Amerol alleges that ACP failed to cite the factual source of the statements submitted

pursuant to Rule 56.1. *Id.* Because ACP has submitted a revised statement of material facts with the requisite citations to admissible evidence, *see* DE 27, and the evidence upon which ACP relied was all in Amerol's possession at the time the statement was served on it, I find that Amerol was not prejudiced by ACP's failure to cite the relevant sources. Moreover, in light of the fact that Amerol is itself not without sin in this regard, *see* Amerol Stmt. ¶ 2 (lacking a citation to admissible evidence), I prefer to resolve all of the matters before me on the merits rather than delay such resolution while the parties rewrite their supporting papers to achieve technical compliance with a rule that is in any event designed to promote, rather than frustrate, decisions on the merits.

With respect to those merits, Amerol asserts the existence of four disputes of material fact that preclude summary judgment on ACP's counter claims: (1) whether ACP made all of the purported deliveries; (2) whether ACP breached the sales contract by delivering defective goods to Amerol, (3) whether Amerol objected to these nonconforming goods within a commercially reasonable time, and (4) whether Amerol revoked its acceptance to these defective goods. Opp. at 7. I address each in turn.

First, there is no genuine dispute of fact as to whether ACP made the deliveries; there is instead only Amerol's conclusory denial that the October 24, 2003 shipment was made and that the other deliveries were made as ordered. Opp. at 10; Amerol Stmt. ¶ 2. Amerol neither offered nor even identified any evidence in support of this argument. Sartorio's affidavit merely repeats the assertion made in Amerol's memorandum of law that "general factual issues [exist] concerning ... whether ACP made all of the alleged deliveries." Sartorio Aff. ¶ 29; Opp. at 6-7. Given Sartorio's knowledge of other matters, I would expect him to be in a position to have

identified with greater specificity what those "genuine factual issues" are if they actually exist. Amerol also claims, without citation to any legal authority, that ACP's invoices are insufficient evidence to support the proposition that the deliveries occurred. Opp. at 10; Sartorio Aff. ¶ 5. This argument is incorrect as a matter of law (or, to the extent stated as a factual assertion in Sartorio's affidavit, insufficient as a matter of logic). *See Jim-Mar Corp,* 600 N.Y.S.2d at 791-792. Moreover, Amerol concedes that four of the five shipments were received, concurs that there was a course of dealing between the parties, and even introduced as evidence of this course of dealing invoices for shipments predating those currently at issue that are identical to those introduced by ACP. Amerol Stmt. ¶¶ 1, 2, 4; Sartorio Aff. Ex. 1. Amerol's attempt to raise a dispute as to whether the deliveries actually occurred accomplishes no more than to cast a "metaphysical doubt" on this element of ACP's counterclaim (if indeed it accomplishes even that) and is therefore insufficient as a basis for denying summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Amerol's second try at opposing summary judgment makes a more promising start, but ultimately fails as well. As a general rule, summary judgment on a claim for goods sold and delivered is inappropriate where the party opposing summary judgment has raised an issue of material fact regarding the defendant's breach of the sales agreement. *See Created Gemstones, Inc. v. Union Carbide Corp.*, 47 N.Y.2d 250, 255-256 (N.Y. 1979); *Flick Lumber Co. v. Breton Indus., Inc.*, 636 N.Y.S.2d 169, 169 (App. Div. 1996). However, an important exception bars application of this rule in the present case. "When … goods are received and accepted by the buyer … the seller is entitled to recover the contract price for such goods, *even if the goods are defective* …." *Orbis Co. Inc. v. Rivera,* 529 N.Y.S.2d 104, 105 (App. Div. 1988) (emphasis

added and citations omitted).  The buyer's claim arising from the delivery of defective goods is

distinct from its obligation on the contract price; it is not a defense to the seller's claim for

payment for the accepted goods, and it may proceed even where the seller has won his own claim

on summary judgment.  *See Avis Rent A Car System, Inc. v. McNamara Buick Pontiac, Inc.*, 455

N.Y.S.2d 643, 643 (App. Div. 1982); *Paul Conte Cadillac, Inc. v. C.A.R.S. Purchasing Service,*

*Inc.*, 511 N.Y.S.2d 58, 60 (App. Div. 1987).

Amerol's third objection to summary judgment – the proposition that there exists a factual

dispute as to the timeliness of its objection to nonconforming goods – is simply inapposite.  More

precisely, it adds nothing to the analysis occasioned by consideration of Amerol's other

arguments.  To the extent Amerol seeks to escape liability for payment on the ground that the

items ACP delivered were nonconforming, its legal theory is unavailing and therefore the matter

of when it first described the shipment as nonconforming is immaterial.  To the extent that the

quality of the notice itself is important, the only material question is that raised by Amerol's

fourth argument:  namely, that the notice effectively rejected, or revoked an earlier acceptance of,

ACP's shipment.  I therefore turn to that final issue.

Doing so presents some difficulty, as Amerol tends to blur legally distinct concepts in its

discussion.  Peppered throughout Amerol's various submissions is its assertion that it *revoked* its

acceptance of the November 19 shipment.  *See*, *e.g.*, Opp. at 7, 9, 22-23; Amerol Stmt. ¶¶ 3-4;

Sartorio Aff. ¶ 30.  But Amerol does not cite the law relevant to that claim of revocation –

instead, it only cites to § 2-602(1) (which provides for a buyer's *rejection* of non-conforming

goods) and § 2-607(3) (which provides for an *accepting* buyer's right to damages).  *See*, *e.g.*,

Opp. at 9 ("In accordance with [N.Y.] UCC § 2-602(1) and § 2-607(3)(a), Amerol revoked its

acceptance of the defective goods.").  The statutory provision that is actually germane to Amerol's claim of revocation is one that Amerol does not cite.  For the sake of clarity, I provide the pertinent part of its text below.

### § 2-608.  Revocation of Acceptance in Whole or in Part

(1) The buyer may revoke his acceptance of a … commercial unit whose non-conformity substantially impairs its value to him if he has accepted it …

(b) without discovery of … non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it …. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

N.Y. UCC § 2-608.

In positing that it made a legally sufficient revocation of ACP's shipment, Amerol seeks to rely on the two letters its attorneys sent to ACP and Atkins, respectively, within a week of receiving Aquarium's complaint.  *See* Opp. at 7-10.  ACP argues that those letters lacked the specificity required to serve as notice of rejection or revocation under New York law.  Reply at 9, 11.  I agree.  As noted above, neither letter provides any explicit or otherwise clear indication that Amerol intended to reject the goods or revoke its prior acceptance.  Although the letters sufficed to preserve Amerol's claims for damages, neither letter included a sufficiently "clear and unequivocal" statement of rejection or revocation.  *See Maggio Importato, Inc. v. Cimitron Inc.*, 592 N.Y.S.2d 325, 326 (App. Div. 1993) ("mere complaint about the [nonconforming] goods does not constitute a clear and unequivocal act of rejection").

None of Amerol's arguments raises a genuine dispute about a fact material to the resolution of ACP's counterclaim for account stated. To the contrary, the undisputed facts show that ACP is entitled to summary judgment in its favor on that counterclaim. Having accepted the ACP's shipment without an effective rejection or revocation, Amerol is liable to ACP for the amounts reflected on the invoices. *See* N.Y. UCC § 2-607(1); *Rivera*, 140 A.D.2d at 678.

      E.      <u>Atkins' Motion To Dimiss Amerol's Tortious Interference Claim</u>

      1.      <u>Threshold Issues</u>

As a threshold matter, I pause to clarify the nature of Amerol's first cause of action. The defendants read the Complaint to raise two distinct claims against both defendants: tortious interference with *current* business relations, and tortious interference with *prospective* business relations. *See* Memo. at 7, 9; Reply at 12-19. Although the Complaint is by no means a model of clarity, the defendants' interpretation of it is unduly pessimistic. Amerol has made only one tortious interference claim against Atkins, and none at all against ACP. Referring to the factual allegations in the Complaint's "Background" section, the operative paragraph of the First Claim For Relief alleges that "[b]y reason of the foregoing, Atkins, Harris & Brown has tortiously interfered with Amerol's *prospective* contracts and business relations." Complaint ¶ 22 (emphasis added). The claim makes no mention of ACP (save for the proofreading error in the caption that Amerol proposes to amend) and speaks only of "prospective" contracts and business relations. Consistent with that plain-language approach to the matter, Amerol's memorandum in opposition to the defendants' motion discusses only the *prospective* interference claim with regard to Atkins. Thus, to the extent the defendants seek to dismiss tortious interference claims

21

against ACP, or to challenge the validity of claims of interference with then-current business relations, their motion is moot.

In its submissions opposing Atkins' motion for dismissal, Amerol again relies on evidence outside of the pleadings to support its theory of liability. *See* Opp. at 22; Sartorio Aff. ¶ 21, Ex. 5. In doing so, it has opened the door for me to convert this part of the dismissal as well into a motion for summary judgment. *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir. 1999). That it has done so suggests that it has "had the opportunity to discover [essential] information" and thus that it will not be prejudiced by the conversion despite the lack of a complete factual record. *Cf. Hellstrom v. U.S. Dept. of Veteran Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (non-moving party must be afforded opportunity for discovery of information essential to its opposition). Moreover, Amerol will not be prejudiced by such a conversion because, as discussed below, I find that the record currently before me raises sufficient questions of fact for the claim to proceed. The conversion also does not prejudice Atkins, as the motion to dismiss would likewise fail and because my decision is without prejudice to any later motion for summary judgment at the close of all discovery.

2.      The Merits Of Amerol's Tortious Interference Claim

The gravamen of the tortious interference claim that Amerol has actually asserted is that Atkins caused it to lose prospective business by calling it a "deadbeat" in telephone and email communications with Amerol's customers. Amerol alleges that Atkins' statements were false, were made with the purpose of intimidating Amerol into paying for defective merchandise, and caused Amerol to lose the future business of unspecified customers. Complaint ¶¶ 16-23.

Under New York law, a plaintiff complaining of a defendant's tortious inference with prospective business relations must prove the following four elements: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play-by-Play Toys & Novelties, Inc.,* 208 F.3d 368, 382-383 (2d Cir. 2000) (citation omitted). To be actionable, the conduct at issue must have caused the third party not to enter into a contractual relationship with the plaintiff. *Advanced Marine Technologies, Inc. v. Burnham Securities, Inc.,* 16 F. Supp.2d 375, 385-386 (S.D.N.Y. 1998). Although these elements are the same as for tortious interference with an existing contract, the action at issue must be "more culpable" to sustain a claim for interference with prospective relations than for interference with an existing contract. *See NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 621 (1996) (citation omitted).

Amerol seeks to satisfy the elements of this claim by proving that Atkins called it a "deadbeat" in telephone and email communications with Amerol's customers claim, and by further proving that such name-calling caused it to lose prospective business. Amended Comp. ¶¶ 16-22. More specifically, Amerol alleges that Atkins' statements were false, were made with the purpose of intimidating Amerol into paying for defective merchandise, and caused Amerol to lose the future business of a customer named Camlin Limited as well as that of other unnamed customers. *Id.* ¶¶ 20-21.

In seeking to defeat this claim, Atkins first argues that Amerol has failed to identify any specific business relations that were adversely affected. Memo. at 11. As a critique of the original Complaint, the point is a sound one, but Amerol proposes to cure the cited defect in its

Amended Complaint. Specifically, Amerol identifies a company called Camlin Limited as a specific customers whose business it claims to have lost as a result of Atkins' conduct. Amended Comp. ¶ 17. Because I conclude that there is good cause to allow Amerol to file an amended pleading, Atkins' first point is unavailing.

Atkins' next challenge to the viability of the tortious interference claims fares somewhat better. It argues that Amerol has failed to offer any evidence of malicious intent or actionable, wrongful conduct on Atkins' part that caused Amerol to lose any business. As to the latter charge, I agree. Under New York law, wrongful conduct sufficient to sustain a claim for tortious interference with prospective business relations consists of "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *NBT Bancorp Inc.*, 87 N.Y.2d at 624 (citation omitted). Amerol seeks to satisfy this standard by alleging that Atkins contacted its customers and described it as a "deadbeat" customer. Amended Comp. ¶¶ 16-17. There is nothing about the alleged statements that suggests they would qualify as "physical violence," "fraud," "civil suits [or] criminal prosecutions," or any degree of "economic pressure." Amerol therefore seeks to satisfy the second element of the tortious interference claim by characterizing the alleged statement as a misrepresentation. *Id*. ¶ 18 (alleging that the statements were "untrue at the time they were made"). But on a motion for summary judgment, a conclusory allegation does not suffice to overcome uncontested facts to the contrary. *See Quinn v. Syracuse Model Neighborhood Corp*., 613 F.2d 438, 445 (2d Cir. 1980) ("The litigant opposing summary judgment . . . 'may not rest upon mere conclusory allegations' . . . as a vehicle for obtaining a trial.") (quoting *SEC v. Research Automation Corp*., 585 F.2d 31, 33 (2d Cir. 1978)).

24

Accordingly, to defeat summary judgment on the basis of this alleged statement, Amerol must be in a position to prove that the statement it attributes to Atkins – namely, that Amerol was "a 'deadbeat' customer that did not pay its bills," Amended Comp. ¶ 16 – was a misrepresentation if it was in fact made.  Webster's defines the operative word at issue thusly:

> **deadbeat** *n* [prob. fr. [4]*dead + beat* (v.)] **1** *chiefly Austral* **:** a man without financial resources  **2 :** one that habitually fails to pay his debts or to pay his way **:** SPONGE

*Webster's Third New International Dictionary of the English Language, Unabridged* 579 (2002). As none of the parties appears to be "chiefly Austral[ian]" or given to using the idiom of the Land Down Under, the issue with respect to the second element of the tortious interference claim thus reduces to the task of determining if there is a factual dispute as to whether describing Amerol as a company "that habitually fails to pay [its] debts" would constitute a misrepresentation.  As explained below, there is no such genuine issue of disputed fact.

The parties agree that at the time Atkins engaged in the conduct alleged, Amerol owed ACP for multiple shipments and had failed to make payments according to the schedule proposed by its own officer Santorio.  Moreover, Amerol's repeated failures to make scheduled payments occurred prior to January 23, 2004 (the date of Aquarium's report that it found a razor blade in the shipment of MCC it received from Amerol); accordingly, there is nothing in the record to undermine the proposition that Amerol did indeed have "debts" that it repeatedly failed to pay. In other words, regardless of whether Atkins actually did call Amerol "a 'deadbeat' customer that did not pay its bills," Amended Comp. ¶ 16, it appears from the undisputed facts in the record that it could accurately – if uncharitably – have done so.  The fact that as of January 23, 2004, Amerol might have had a reason to *continue* to fail to pay its bills does nothing to change the fact

that the statements Amerol attributes to Atkins appear to have been technically accurate when begun. Nor does it make false any similar statements made after January 23, 2004, as Amerol had arguably already become a "deadbeat" within the dictionary definition of the term and also because the second part of the statement – that Amerol did not pay its "bills" as opposed to "debts" that might have become unenforceable by virtue of Aquarium's complaint – continued to be accurate.

Moreover, the record does not support the assertion that Atkins even made the statements at issue. The only evidence to that effect is a conclusory statement in Sartorio's affidavit that cites in turn to an email from Camlin Limited, the sole identified customer whose business Amerol claims to have lost. *See* Sartorio Aff. ¶¶ 21, 24-27, Ex. 5 (email from G.D. Kalla to Charlie Monteleone). The cited email is more squib than smoking gun. In it, one Terry Brown, who identifies himself as being with Atkins, merely inquires into "the association between Camlin Ltd. and Amerol Corp. out of Farmingdale, New York." *Id*. Ex 5. The email appears to have been forwarded to Amerol by Camlin Limited. Although this email supports Amerol's allegation that Atkins contacted its customers, it does not indicate that Atkins ever defamed Amerol in the manner alleged. The email and the allegedly defamatory statements, even if they occurred precisely as Amerol claims they did, simply do not rise to the level of actionable, wrongful conduct necessary to sustain a claim for tortious interference with business relations.

That Amerol has failed to raise a question of fact regarding Atkins' conduct does not, however, finally dispose of its tortious interference claim. New York law creates an alternate way for a plaintiff to establish liability for the tort if it can establish that the defendant engaged in the conduct at issue with the "sole purpose of harming the plaintiff." *Nadel*, 208 F.3d 382.

Atkins contends that Amerol lacks sufficient proof of such malice to allow its claim to proceed. I disagree.

Amerol alleges that Atkins contacted its customers with "the purpose of intimidating Amerol into paying ACP for defective merchandise." *See* Amended Comp. ¶ 20. Although not artfully pleaded, Amerol's Amended Complaint can fairly be interpreted to assert the following theory of liability: Atkins wished to exert economic pressure on Amerol that would prompt it to pay ACP's invoices; by warning others that Amerol did not pay its bills, Atkins hoped to cause those others to cease doing business with Amerol and for Amerol to understand *why* it was losing business, and further to understand that by paying ACP it would forestall further business losses arising from Atkins' communications. If Amerol can establish that proposition, it will be able to show the malice necessary to satisfy the third element of a tortious interference claim under New York law.

Amerol's Amended Complaint thus suffices – barely – to withstand a motion to dismiss and the question therefore becomes whether the evidence outside the pleadings shows any prospect that Amerol will be able to prove the claim it has pleaded. The record contains nothing more on this score than the affidavit of Amerol's Chief Executive Officer, who swears that he has personal knowledge that Atkins contacted Amerol's customers for the purpose of intimidating Amerol into paying for goods. Sartorio Aff. ¶ 25. Sartorio's conclusory assertion may suffice to raise a question of fact as to whether Atkins acted with malice in the absence of any evidence of a legitimate purpose. *Cf. Snyder v. Sony Music Entertainment*, 684 N.Y.S.2d 235, 239 (defendants' evidence of legitimate, non-tortious reasons for contacts alleged to constitute tortious interference sufficient to defeat plaintiff's claim). More important, I cannot say that a

fuller record after more discovery will preclude a finding of fact in Amerol's favor on this part of its claim.

The remaining elements of a tortious interference claim (interference and damages) combine to require that Amerol show that Atkins' actions caused it to lose prospective business, and that it was damaged as a result. Amerol has made sufficient allegations in this regard: it asserts that Atkins' communications with Amerol's customers caused Camlin Limited and other unnamed customers "to cease to transact business with Amerol" and that its business relations with these clients would have continued "but for" Atkins' conduct. Amended Complaint ¶¶ 19, 21. Amerol claims to have annual profits in an amount not less than $38,192. *Id.* ¶ 22. If true, these allegations would suffice to show that but for Atkins' conduct, a contract would have been executed, and that Amerol has sustained damages. Thus, while conspicuously lacking in factual details, the pleadings sufficiently state a claim for tortious interference with prospective business relations, and dismissal would not be warranted on the pleadings alone. Similarly, Sartorio's affidavit, in which he essentially parrots the allegations in the complaint, *see* Sartorio Aff. ¶¶ 24, 26-27, suffices to raise a question of fact on this score – at least on the current record. I therefore cannot dispose of Amerol's tortious interference claim at this juncture either by granting dismissal or by granting summary judgment.

IV.   Conclusion

For the reasons set forth above, I grant Amerol's application to amend its complaint, deny the defendants' motion for summary judgment on Amerol's claims without prejudice to renewal at the close of all discovery, and grant ACP's motion for summary judgment in its favor on the counterclaim for account stated. All counsel for Amerol, Atkins, and ACP are directed to meet

and confer and to submit no later than April 11, 2006, a joint proposal for completing all

discovery, and to appear before me in Room 456 in the United States Courthouse in Brooklyn for

a status conference on April 18, 2006, at 9:30 a.m.

**SO ORDERED.**

Dated: Brooklyn, New York
       March 17, 2006

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge